# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>SHACHEEN LEIGH RUSSELL,<br><br>  Defendant. | CR 24-44-BLG-SPW<br><br>ORDER |

Before the Court is a Motion to Suppress filed by Defendant Shacheen Russell. (Doc. 24). Russell seeks to suppress all evidence discovered during a traffic stop and the evidence subsequently discovered in a probationary search of her residence. (Doc. 25). Russell argues that the evidence seized must be suppressed because the traffic stop violated the Fourth Amendment, and any evidence subsequently found is subject to the exclusionary rule. (*Id.*). The United States opposes the motion. (Doc. 29). On August 28, 2024, the Court held a hearing on the matter, during which Billings Police Department Detective Steve Hallam, Billings Police Department Officer Bret Hilde, and ATF Task Force Officer Dustin Stroble testified.

Considering the parties' briefing and the testimony and evidence presented at the hearing, the Court denies Russell's motion.

1

I.     **Factual Background**[1]

In early October 2023, Detective Hallam received information from a source known to Detective Hallam but who wished to remain anonymous, that a female named "Scheen" was attempting to sell or trade guns for drugs. (Doc. 25-1 at 4). The source told Detective Hallam that "Scheen" lived at 349 S. Billings Boulevard in Billings, Montana and drove a white Cadillac SUV Escalade. (*Id.*). Detective Hallam investigated the information and discovered a female named Shacheen Russell lived at 349 S. Billings Boulevard in Billings, Montana and was on probation with Montana State Probation and Parole. (*Id.*).

On October 4, 2023, Billings Police Department Street Crimes Unit officers began conducting surveillance at 349 S. Billings Boulevard. (*Id.*). They observed Russell at the residence and a white Cadillac Escalade parked out front. (*Id.*). Task Force Officer Stroble observed Russell exit the house, enter the driver's seat of the Cadillac Escalade, move the car a vehicle width to the north, and then return to the

---

[1] The facts are based on the reports of Detective Hallam, Officer Hilde, Officer Jayden Romero, and Task Force Officer Stroble (Doc. 25-1; 25-2; 25-3; and 25-4); the supplemental reports of Officer Hilde, Detective Hallam, and Task Force Officer Stroble (Doc. 34); and the testimony of Detective Hallam, Officer Romero, and Task Force Officer Stroble during the suppression hearing. Doc. 34 contains a supplemental report filed by ATF Task Officer Stroble on August 20, 2024, after meeting with the Assistant United States Attorney, Kelsey Sabol on August 19, 2024. Officer Stroble's original report was filed on November 7, 2023. Doc. 34 contains a supplemental report filed by Detective Hallam on August 20, 2024, after meeting with the assistant United States Attorney, Kelsey Sabol on August 19, 2024.  Detective Hallam's original report was filed on October 18, 2023. (Doc 25-2). At the suppression hearing Detective Hallam stated that he did not include this information originally because he did not think it was relevant.

2

house. (Doc. 34 at 10). Officer Stroble identified Russell through magnified optics and a reference photo. (*Id.*). Detective Hallam also reported that Russell was coming and going from her house to the white Cadillac Escalade on that day. (Doc. 25-1 at 2).

During their surveillance on the same day, Detective Hallam, Officer Romero, and Task Officer Stroble observed a white Ford Taurus park at 349 S. Billings Boulevard. (Doc. 25-1 at 2; Doc. 25-2 at 1; and Doc. 25-4 at 2). The driver of the vehicle, John Schmieding, exited the car, entered the residence, and then left after a short period of time. (*Id.*; Doc 25-2 at 1; Doc 25-4 at 2).

Also on that day, the anonymous source told Detective Hallam they were in contact with Russell and were asked by Russell if they wanted to purchase any of the guns that were arriving at the residence. (Doc. 34 at 8). Russell told the source when Schmieding was en route to her home with the guns. (*Id.*). Russell then told the source that the guns had arrived at the residence, and the source relayed this information via telephone to Detective Hallam. (*Id.*). The anonymous source wanted to go to Russell's house to "put eyes on the firearms" but was told "no" by Detective Hallam. (*Id.*). Detective Hallam observed Russell and Schmieding walk toward the back of the white Ford Taurus, open the trunk, and close it. (*Id.*). After Schmieding left the residence, the officers began to follow him. (Doc. 25-1 at 2).

Detective Hallam noticed that Schmieding's plates were expired and pulled him over. (*Id.*). After pulling over, Schmieding opened his door and attempted to exit the vehicle. (*Id.*). Detective Hallam ran towards Schmieding, "gained control over him," and placed him in handcuffs. (*Id.*). Detective Hallam informed Schmieding he was seizing the vehicle pending a search warrant. (*Id.* at 3). A search warrant was granted the same day, and law enforcement found multiple weapons in the trunk. (*Id*). Following Schmieding's arrest, Officers Stroble, Hilde, and Romero returned to Russell's residence and attempted to contact her. (Doc. 25-2 at 2-3). Russell did not open the door, so the officers left. (*Id.* at 3).

On October 16, 2023, Detective Hallam received another tip from the same source that Russell was carrying a 9mm pistol. (Doc. 25-1 at 4). Detective Hallam, Officer Romero, and Officer Hilde resumed surveillance on Russell's residence on October 17, 2023. (*Id.*; Doc. 25-2 at 4; and Doc. 25-3 at 2). On that day, they observed the white Cadillac Escalade parked outside Russell's home. (Doc. 25-2 at 4; Doc. 25-3 at 2). Officer Hilde observed two Native American women enter the Cadillac Escalade and leave the residence going southbound. (Doc. 25-3 at 2). Both women had long dark hair and appeared to be of similar height and age. (Doc. 29 at 16). Officer Hilde reported that he believed the driver of the vehicle was Russell. (Doc. 25-1 at 4). At the suppression hearing, Officer Hilde testified that he used a driver's license photo as a reference to identify Russell.

4

Knowing Russell had a revoked license, Detective Hallam followed the vehicle, activated his police lights, and initiated a traffic stop. (Doc. 25-1 at 4). Montana Probation and Parole Officer Skillen arrived on the scene shortly after. (Doc. 25-4 at 3). The vehicle's driver identified herself as Shyrhea Medicinetop to Detective Hallam, and the vehicle's passenger identified herself as Shacheen Russell to Officer Romero. (Doc. 25-1 at 4; Doc. 25-2 at 4). After Medicinetop exited the vehicle, Detective Hallam observed a small plastic baggie on the driver's side floorboard that he believed contained meth and fentanyl. (Doc. 25-1 at 5).

Probation Officer Skillen authorized a probation search of the vehicle "based on it being the vehicle Russell has been driving and the fact she was in the vehicle." (*Id.*; Doc. 25-5 at 2). During the search, officers discovered meth, a scale, and assorted ammunition. (Doc. 25-1 at 5). Officer Skillen and the other officers returned to Russell's residence. (*Id.*). Officer Skillen told the individuals in the residence that he was "going to do a probation search of the residence due to Russell's probationary status." (*Id.*). During the search of Russell's room, officers found four grams of fentanyl powder and a Sig Sauer 9mm pistol with the serial number removed. (*Id.*).

On March 21, 2024, Russell was charged in this Court with being a prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc 2).

## II. Legal Standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. A traffic stop is a "seizure" within the meaning of the Fourth Amendment. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). Similar to a *Terry* stop, law enforcement only needs reasonable suspicion that a crime has occurred to conduct an investigatory stop or seizure. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000). "Reasonable suspicion is defined as 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (quoting *United States v. Cortez*, 499 U.S. 411, 417–18 (1981)). Reasonable suspicion requires specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct. *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000).

The reasonable suspicion standard is "not a particularly high threshold to reach" but "a mere hunch is insufficient." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013). "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence and less than probable cause." *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000). In determining whether reasonable

suspicion exists, the underlying facts are considered in their totality and in light of the officer's experience. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

If law enforcement violates a defendant's Fourth Amendment right to be free from unreasonable searches and seizures, then, under the exclusionary rule, "all evidence seized as a result of the unconstitutional actions of law enforcement must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).

### III. Analysis

In her motion to suppress, Russell makes three arguments: 1) that the initial traffic stop was not a "run-of-the-mine" stop and the basis of the stop was pretextual; 2) that law enforcement lacked the necessary reasonable suspicion to make a traffic stop based on their observations on October 4th and October 17th; and 3) that law enforcement lacked the necessary reasonable suspicion to make a traffic stop based on the anonymous tip. (Doc. 25). In response the Government did not address the pretextual stop argument and instead asserted that the traffic stop was supported by sufficient reasonable suspicion based on either: 1) the officers' observations on

October 4 and October 17; or 2) the information received from the anonymous source. (Doc. 29).

The Court will first address whether the traffic stop was a "run-of-the-mine" stop. Then, it will determine whether the stop was based on sufficient reasonable suspicion and whether Russell's mistaken identification negated that reasonable suspicion. Lastly, the Court will address whether the anonymous tip provided to Detective Hallam supported a traffic stop based on reasonable suspicion.

A.   *Standard for a Pre-Textual Stop*

Russell argues that the traffic stop on October 17, 2023, violated her Fourth Amendment rights because the basis of the stop was pre-textual. (Doc. 25 at 10-11). Russell concedes that when the circumstances of a "run-of-the-mine" traffic stop, viewed objectively, are sufficient to justify detaining a driver, the subjective intent of the law officers is irrelevant. (*Id.* at 11). But Russell argues that the reason for the stop is unclear and cannot be "categorized as solely a traffic stop," placing the stop outside the "run-of-the-mine case" framework. (*Id.* at 12). The Government did not address this argument in their response.

"A pretextual stop occurs when the police use a legal justification to make the stop to search a person or place for which they do not have reasonable suspicion necessary to support a stop." *United States v. Cannon*, 29 F.3d 472, 474 (9th Cir.

1994). However, if the objective and particularized facts known to the police provide reasonable suspicion to justify a traffic stop, "the stop is lawful even if the officer made the stop only because he wished to investigate a more serious offense." *Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) (citing *Whren v. United States*, 517 U.S. 806, 812–13 (1996)). When the circumstances are sufficient to justify a traffic stop based on reasonable suspicion, the subjective intent of the law enforcement officer is irrelevant. *United States v. Orozco,* 858 F.3d 1204, 1210 (9th Cir. 2017).

Russell argues that these rules only apply to "run-of-the-mine cases." (Doc. 25 at 11-12). A "run-of-the-mine" case is "the ordinary case that is governed by 'the traditional common law rule that probable cause justifies a search and seizure.'" *United States. v. Ibarra*, 345 F.3d 711, 715 (9th Cir. 2003) (quoting *Whren*, 517 U.S. at 819). In *Whren*, the Court defined cases that were not run-of-the-mine as "searches or seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests – such as, for example seizure by means of deadly force, unannounced entry into a home without a warrant, or physical penetration of the body." *Whren*, 517 U.S. at 818 (citations omitted). To be outside the "run-of-the-mine" case, the traffic stop must be an extreme practice and not just outside the norm. *Id.*

The Court finds that the stop made by Detective Hallam was conducted in an ordinary manner and qualifies as a "run-of-the-mine" stop. Officers did not use deadly force when pulling over Russell, did not intrude on her home, or utilize any physical penetration of her body. They simply activated their lights and pulled the car over. Therefore, the Court's holding in *Whren* applies to the present case, and the officers' subjective intentions are irrelevant when evaluating the legality of the stop.

B.   *Reasonable Suspicion to Stop Russell*

1.   *Reasonable Suspicion*

Russell next argues that the traffic stop was illegal because the officers lacked the necessary reasonable suspicion to pull her over. (Doc. 25 at 12). The Government disagrees and asserts that the information provided by the informant, observations of the police on October 4th and 17th, and Detective Hallam's knowledge that Russell had a revoked license provided the necessary reasonable suspicion to initiate a traffic stop. (Doc. 29). It contends that even though Russell was not the registered owner of the white Cadillac Escalade, the officers reasonably inferred that Russell was driving the vehicle on October 17. (*Id.* at 15).

Officers may rely on probabilities in the reasonable suspicion context. *Kansas v. Glover*, 589 U.S. 376, 377 (2020); *see also United States v. Sokolow*, 490 U.S. 1,

8–9 (1989). In *Glover*, a deputy sheriff ran the license plate of a pickup truck, discovered that the truck was registered to Charles Glover Jr., and that Glover had a revoked driver's license. *Glover*, 589 U.S. at 379. Based solely on this information, the sheriff initiated a traffic stop. *Id.* The Court denied Glover's motion to suppress, finding that an officer may reasonably infer that the vehicle's registered owner is the individual driving the vehicle, unless there are facts that negate this inference. *Id.* at 385–86. ("For example, if an officer knows that the registered owner of the vehicle is in his mid-sixties but observes that the driver is in her mid-twenties, then the totality of the circumstances would not 'raise a suspicion that the particular individual being stopped is engaged in wrongdoing.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981))). An unrebutted inference that an individual with a revoked license is operating their vehicle creates sufficient reasonable suspicion to conduct a traffic stop. *Id.* at 386.

Here, although Russell was not the registered owner of the vehicle, the logic of *Glover* applies because the police officer's observations of Russell created a reasonable inference that she was the driver of the white Cadillac Escalade, and the officers knew she had a revoked driver's license. The anonymous source told Detective Hallam that Russell drove a white Cadillac Escalade, and the other officers observed the Escalade parked at Russell's residence on October 4 and October 17. On October 4, Officer Stroble witnessed Russell enter the Cadillac Escalade and

11

move the vehicle to another parking spot. On the same day, Detective Hallam witnessed Russell move from the house to the vehicle. On October 17, Officer Hilde witnessed a Native American woman matching Russell's description enter the driver's seat door. Using Russell's most recent license photo, Officer Hilde identified her as the driver. Based on the totality of circumstances, the officers reasonably inferred that the vehicle was Russell's and that she was driving the vehicle on October 17 with a revoked license.

    2.    *Mistake of Fact*

Alternatively, Russell argues that her mistaken identification as the driver makes the traffic stop illegal, even if it was based on sufficient reasonable suspicion. (Doc. 25 at 13). Russell contends that misidentifying her as the driver is not a mistake of "reasonable men." (*Id.*). According to Russell, the mistake was unreasonable because "the driver of the vehicle stopped…looks nothing like Russell other than she is also Native American." (*Id.*). The Government contends that the mistake does not make the otherwise legal stop illegal because the mistake was reasonable. (Doc. 29 at 16–17). It asserts that Officer Hilde's mistaken identification was reasonable because he "watched two women matching Russell's

description get into the vehicle and...reasonably inferred Russell was driving her own car." (*Id.* at 17).

The fact that Russell was the vehicles passenger and not the driver does not make the stop illegal if the mistaken factual belief was held reasonably and in good faith. *United States v. Twilley*, 222 F.3d 1092, 1096 n. 1 (9th Cir. 2000). The Ninth Circuit has distinguished mistakes of fact from mistakes of law when determining whether an officer had the reasonable suspicion necessary to effectuate a traffic stop. "If an officer makes a traffic stop based on a mistake of law, the stop violates the Fourth Amendment." *Id.* at 1096. However, "a mere mistake of fact will not render a stop illegal, if the objective facts known to the officer gave rise to a reasonable suspicion that criminal activity was afoot." *United States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002). In short, an officer's correct understanding of the law and a good-faith mistake regarding the facts can still establish reasonable suspicion. *United States v. Kings*, 244 F.3d 736, 739 (9th Cir. 2001).

Here, Officer Hilde had a good faith but mistaken belief that Russell was the individual entering the driver's side door of the white Cadillac Escalade. Based on the information provided by the source and the officers' observations of Russell using the vehicle on October 4th, the officers believed that Russell was the driver of the vehicle. Then, on October 17, Officer Hilde observed two women approaching the vehicle, both of whom fit the physical description of Russell. Both women were

Native American, had long dark hair, and appeared to be of similar height and age. Further, when identifying the individual entering the driver's seat, Officer Hilde relied on the driver's license photo of Russell to identify her. Based on their observations, it was reasonable for the officers to believe Russell was driving the vehicle.

The officer's belief that Russell was the driver was a good faith but mistaken belief of fact, and they correctly understood that the law allows a traffic stop when officers know an individual is driving with a revoked license. Therefore, the fact that Russell was the passenger and not the driver does not render the stop illegal under the Fourth Amendment. Accordingly, Russell's traffic stop was based on reasonable suspicion, and the officers' mistake did not make the otherwise legal traffic stop illegal. Suppression is not warranted on this ground.

### C. Anonymous Tip

The Government alternatively argues that if the officers' observations failed to establish the necessary reasonable suspicion to initiate a traffic stop on Russell, the anonymous source's information that Russell was carrying a 9mm firearm was sufficient. (Doc. 29 at 18–19). The Government argues that law enforcement corroborated a substantial amount of the information provided, and therefore, the tip was sufficiently reliable to justify a traffic stop. (Doc. 29 at 19–20). Russell

disagrees and asserts that the anonymous tip lacks the necessary indicia of reliability to establish reasonable suspicion. (Doc. 30 at 2–3).

Law enforcement may rely on a source's information as a basis for establishing reasonable suspicion. *Illinois v. Gates*, 462 U.S. 213, 242 (1983). Even anonymous tips can give rise to reasonable suspicion as long as there are "sufficient indicia of reliability to justify the investigatory stop." *Alabama v. White*, 496 U.S. 325, 332. When considering whether a source's tip is sufficient to support a finding of reasonable suspicion, the Court "must employ a 'totality-of-the-circumstances approach' that takes into consideration the informant's 'veracity' or 'reliability' and his 'basis of knowledge.'" *United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006) (quoting *Gates*, 462 U.S. at 238). In the Ninth Circuit, courts consider four factors that bear on a tip's reliability and veracity: (1) whether the informant is known, rather than anonymous; (2) whether the informant has a proven track record of reliability, as opposed to an unproven informant; (3) whether the informant reveals the basis for their knowledge; and (4) whether the tip provides "detailed predictive information about future events that is corroborated by police observation." *Id.* at 907–08.

Here, the first factor favors Russell, as the informant is anonymous. For "a confidential informant to be deemed 'known,' the affidavit must acknowledge that the police know the informant's identity or that the identity has been disclosed under

oath to the issuing judge." *See United States v. May*, 399 F.3d 817, 823 (6th Cir. 2005). At the suppression hearing, Detective Hallam initially testified that he has known the informant for approximately 13 to 14 years. However, later in his testimony, Detective Hallam conceded that the information came from an anonymous source. Further, Detective Hallam's original police report from October 18, 2023 and his supplemental report from August 19, 2024 stated that he received information from an individual who wished to remain anonymous. (Doc. 25-1 at 4; Doc. 34 at 8). Officer Stroble's report also stated that "Steve Hallam had received information from an individual who wished to remain anonymous." (Doc. 25-4 at 2).

The second factor also favors Russell, as there is no evidence that the source had a proven track record of reliability. Courts do not accept an affiant's unsupported assertion that a source is reliable. *See United States v. Allen*, 211 F.3d 970, 975–76 (6th Cir. 2000); *United States v. Reddrick*, 90 F.3d 1276 (7th Cir. 1996). At the suppression hearing, Detective Hallam testified the anonymous informant had provided reliable information in the past. However, no evidence was presented to the Court to verify this claim. Due to the lack of evidence supporting the informants past reliability, the second factor weighs in favor of Russell.

The third factor weighs in favor of the Government, because the source told Detective Hallam that they were in telephone communication with Russell. An

"informant's tip is considered more reliable if the informant reveals the basis of knowledge of the tip—how the informant came to know the information." *Rowland*, 464 F.3d at 908. On October 4, 2023, while surveilling Russell's residence, Detective Hallam was in telephone communication with the source. The source informed Detective Hallam that they were in "phone contact" with Russell and that Russell had told the source that Schmieding was en route to the residence with guns. When Schmeiding arrived at the house, Russell relayed this information to the source, who informed Detective Hallam. Since Detective Hallam revealed the basis of the anonymous source's knowledge, the third factor weighs in favor of the State.

Lastly, the fourth factor favors Russell as the source did not provide any "predictive information about future events." An anonymous tip that contains a "range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted" bolsters reliability of the tip. *Alabama v. White*, 496 U.S. 325, 332 (quoting *Gates*, 462 U.S. at 245). Anyone can predict facts existing at the time of the tip; what is important is the tipster's ability to predict the respondent's future behavior because it demonstrates inside information and a special familiarity with the defendant's affairs. *Id.*

Here, the police could only corroborate the easily obtained facts and conditions existing at the time of the tip. The anonymous tipster informed police

17

that Russell: 1) lived at 349 S. Billings Boulevard; 2) drove a white Cadillac Escalade; 3) was trading or selling guns for drugs; and 4) was carrying a 9mm pistol. The officers confirmed that Russell lived at 349 S. Billings Boulevard and drove a white Cadillac Escalade but could not confirm any of the other information provided. The officers never observed Russell trading or selling guns for drugs. Though they pulled over Schmieding after leaving Russell's residence and discovered various guns in his trunk, the officers did not witness Schmeiding take the weapons from Russell's residence or anything else that would indicate Russell had sold or traded the guns to Schmeiding. Further, police never observed Russell carrying around a 9mm firearm. Though they discovered a 9mm firearm in Russell's room, this occurred after the traffic stop and, therefore, cannot be used to bolster the anonymous source's credibility prior to the stop. Since the officers only corroborated information from the informant that was "easily obtainable," such as where Russell lived and what she drove, factor four weighs in favor of Russell.

In viewing the totality of the circumstances, the anonymous source did not have sufficient indicia of reliability to support the reasonable suspicion necessary to conduct a traffic stop. Accordingly, the Government cannot use the anonymous tip as the basis for conducting a traffic stop on Russell.

## IV. Conclusion

For these reasons, the Court finds law enforcement did not violate Russell's Fourth Amendment rights, when they conducted the traffic stop on the white Cadillac. All of the evidence obtained as a result of the search of the Cadillac Escalade and Russell's residence is admissible.

IT IS HEREBY ORDERED that Defendant Shacheen Leigh Russell's Motion to Suppress (Doc. 24) is DENIED.

DATED this 19th day of September, 2024.

SUSAN P. WATTERS
United States District Judge